NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**CLAIRE M. FAY, DCB #358218**
Assistant United States Attorney
Claire.Fay@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## [PORTLAND DIVISION]

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:19-cr-00183-MO** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **LORI E. DEVENY,** | |
| **Defendant.** | **Sentencing: 01/09/2023 @ 10:30 a.m.** |

## I.        INTRODUCTION

Disgraced former Oregon lawyer Lori E. Deveny used lies, manipulation, and deceit to

defraud at least 135 clients out of more than $3.8 million.[1]  Many of Deveny's client victims

---

[1] The Oregon State Bar began investigating Deveny in approximately November 2017 after numerous complaints about her misconduct had been made.  The Oregon Bar Disciplinary Counsel's Office filed a petition for Deveny's suspension from the practice of law on March 21, 2018 (Exhibit 1).  Deveny submitted a Form B Resignation from the Practice of Law on May 24, 2018, and her resignation was accepted by Oregon Supreme Court Chief Judge Martha L. Walters on July 26, 2018 (Exhibits 2 and 3).  A Form B Resignation is a resignation from the Bar while an inquiry, grievance, or disciplinary proceeding is pending.  *See* Bar Rules of Procedure 9.1 and 13.7.

**Government's Sentencing Memorandum**                                                      **Page 1**

were particularly vulnerable to her criminal behavior, because they had been in accidents that resulted in serious brain and body injuries.  Deveny's clients were awaiting payments from insurance company claims that she had filed on their behalf.  To accomplish her fraudulent scheme, defendant Deveny stole the identities of countless clients, forged insurance checks made payable to them, deposited their funds to her bank accounts, and continually lulled clients into a false sense of hope that they would receive compensation for their injuries.  Once she received her victims' insurance proceeds, Deveny used the money to fund her and her husband's lavish lifestyle.

The Oregon State Bar Client Security Fund (CSF), Wells Fargo Bank, and the Internal Revenue Service also suffered losses as the result of Deveny's fraudulent schemes.  When they learned that they had been deceived, many of Deveny's clients filed complaints with the Oregon State Bar seeking reimbursement from the CSF.  The CSF made partial restitution payments to some of Deveny's clients, resulting in a loss of more than $1.2 million to the CSF.  This constituted one of the largest losses in the Oregon Bar's history and resulted in the Bar raising the dues of all members for two years to cover the cost of the payments.

Wells Fargo Bank lost more than $52,000 because of Deveny's flagrant theft and forgery of a law firm's check representing an insurance payout to one of defendant's former clients.

Seeking to evade detection of her criminal schemes, defendant Deveny never reported the money she stole from her clients as income on her federal tax returns for 2011 through 2017.  Consequently, defendant owes the Internal Revenue Service $621,137 in past due taxes on her ill-gotten gains.

**Government's Sentencing Memorandum**                                                      **Page 2**

Deveny's thefts, manipulation, lies and deceit have resulted in total losses to all victims of $4,558,889.28.

Lori Deveny's egregious and reprehensible conduct warrants a sentence of 87 months in prison on the fraud, tax, and money laundering convictions, a 24-month mandatory consecutive prison sentence on the aggravated identity theft convictions, a supervised release term of three years, payment of a special fee assessment of $700, and payment of full restitution to the victims of her criminal conduct.

Defendant poses a financial danger to the community, and the government will be recommending that the Court take her into custody at the conclusion of the sentencing hearing pursuant to 18 U.S.C. § 3143 (a).[2]

## II.    STATUS OF THE CASE

On May 7, 2019, a federal grand jury issued a 24-count Indictment charging Deveny with six counts of Mail Fraud, in violation of 18 U.S.C. § 1341; six counts of Wire Fraud, in violation of 18 U.S.C. § 1343; one count of Bank Fraud, in violation of 18 U.S.C. § 1344; two counts of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; two counts of Engaging in Monetary Transactions with Criminally Derived Property, in violation of 18 U.S.C. § 1957; two counts of Making and Subscribing a False Federal Income Tax Return, in violation of 26 U.S.C. § 7206(1); and five counts of Failure to File a Federal Income Tax Return, in violation of 26 U.S.C. § 7203 (ECF No. 1).

---

[2] Defendant has also plead guilty to 28 felony counts of Aggravated Theft I, 7 counts of felony Theft I, and one count of felony Identity Theft in *State of Oregon v. Lori Elaine Deveny*, Multnomah County Circuit Court Case No. 19CR33784. Sentencing is scheduled for January 26, 2023, in this case. Defendant has expressed a desire to serve any state prison sentence in federal prison. In order to accomplish this, defendant would have to be in federal custody at the time she is sentenced in the State of Oregon case.

**Government's Sentencing Memorandum**                                                    **Page 3**

On June 27, 2022, pursuant to a written plea agreement, defendant Deveny plead guilty to Count 1, Mail Fraud, in violation of 18 U.S.C. § 1341; Count 11, Wire Fraud, in violation of 18 U.S.C. § 1343; Count 13, Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; Count 14, Bank Fraud, in violation of 18 U.S.C. § 1344; Count 15, Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; Count 16, Engaging in Monetary Transactions With Criminally Derived Property, in violation of 18 U.S.C. § 1957; and Count 19, Filing a False Federal Income Tax Return for the calendar year 2012, in violation of 26 U.S.C. § 7206(1) (ECF No. 38).

Sentencing is scheduled for January 9, 2023, at 10:30 a.m. before The Honorable Michael W. Mosman (ECF No. 43). Defendant is on release while awaiting sentencing.

## III.     THE OFFENSE CONDUCT AND RELEVANT CONDUCT

### A. Overview of the Case

Defendant Deveny, a sole practitioner in Portland, Oregon, was licensed to practice law in the State of Oregon from approximately September 1989 to May 2018. Deveny provided legal services to clients in exchange for attorney's fees. She specialized in representing clients who had suffered physical injuries as the result of automobile accidents and other traumatizing events (PSR ¶ 35).[3] Over the course of her nearly 30-year legal career, defendant represented hundreds of clients.

Beginning at least as early as April 2011, and continuing through at least May 2019, Deveny knowingly and with intent to defraud, devised a material scheme and artifice to defraud her clients and to obtain money and property of those clients by means of materially false and

---

[3] Clients employed Deveny on contingency, based on the amount of recovery she obtained for the client. Deveny's standard fee was thirty-three and one-third of the amount she recovered for the client if the case settled before trial (Exhibit 4).

**Government's Sentencing Memorandum**                                    **Page 4**

fraudulent pretenses, representations, and promises, and through the omission of material facts that she had a duty to disclose. The source of the stolen funds was insurance proceeds that were due and payable to Deveny's clients (PSR ¶ 37). A variety of insurance companies had made payments to Deveny's clients as the result of filed claims that defendant sent either through the mail or via interstate wire. Deveny forged the names of many of her clients on settlement documents she sent to the insurance companies. In reliance on this false documentation, the insurance companies used the U.S. Postal Service, private commercial carriers, or interstate wire transmissions, to send the insurance proceeds to defendant. Once Deveny received the funds, she deposited the insurance proceeds meant for her clients into her Interest on Lawyer's Trust Account (IOLTA account), Wells Fargo Bank account number X9911 (PSR ¶ 36). To deposit many of the checks, Deveny forged the names of her clients on the endorsement portion of the checks. Deveny then fraudulently converted to her own use, more than her agreed-upon thirty three and one-third percent fee from the insurance proceeds. Defendant did so by making unauthorized transfers of funds from the IOLTA account to her business checking account, her personal bank account, her husband's business bank account, her personal credit card account, and her husband's personal credit card account. Deveny also made large cash withdrawals from her IOLTA account.

Many of Deveny's clients were unaware that the defendant had settled their claims with the insurance companies (PSR ¶ 37). When clients complained about the length of time it was taking for claims to settle, defendant sent them lulling emails or text messages, making a variety of excuses, including: claiming that the insurance companies typically take a long time to settle claims; falsely claiming that she was following up with insurance companies about their delays

in making settlement payments; falsely claiming that the clients' settlements had been delayed by medical liens; claiming that she was ill; claiming that other family members were ill; and other bogus excuses.  Many of Deveny's clients never received any of the insurance proceeds owed to them.   Over the course of at least seven years, Deveny stole more than $3.8 million from her clients.

Deveny used the funds she embezzled from her clients to support a lifestyle that most people only dream of.  Some of Deveny's expenditures included:  making personal credit card and loan payments; taking numerous big game hunting trips to Africa; making payments for taxidermy expenses for big game hunting trophies; purchasing firearms and ammunition; taking trips to Las Vegas and Mexico; visiting a luxury nudist resort; taking cruises and fishing trips to luxury resorts; supporting her husband's photography business/hobby; remodeling her home; purchasing expensive cigars; purchasing a luxury SUV; and paying other expenses associated with her lavish lifestyle.  Deveny also took out large amounts of cash from her IOLTA account, undoubtedly, to spend on herself and her husband.  In Ponzi-like fashion, defendant also used a portion of some clients' stolen funds to pay other clients who had complained about not receiving their insurance settlement proceeds.  In addition to her clients, Deveny also defrauded Wells Fargo Bank by depositing a law firm check she stole and forged, and by using the proceeds to pay her American Express bill and a business loan.  Deveny failed to report the proceeds from her fraudulent schemes on her federal income tax returns for the years 2012 through 2017.

**Government's Sentencing Memorandum**                                    **Page 6**

### B.  The Offense Conduct

Below are descriptions of a small portion of the offense conduct that forms the basis of the crimes Deveny engaged in between at least 2011 and 2019.

### Counts 1 and 12 – Mail Fraud and Wire Fraud

Adult Victim 1 (hereinafter AV1) was the victim of a hit and run accident on January 9, 2014, when he was struck by a car as he crossed the street.  AV1 suffered traumatic injuries that left him in a coma.  Years after the accident, AV1 still had difficulty remembering certain things. While AV1 was recovering from his injuries, he met with defendant Deveny and signed a retainer agreement, although he doesn't recall doing so (PSR ¶ 38).  Deveny instructed him to send all medical bills to her and not to talk with anyone about the case.  AV1 waited years for a settlement from case, but Deveny gave him a myriad of excuses about why the insurance money never came through.

During the time after the accident, AV1 was frustrated by the slow pace of the case and desperate for money.  He had to move out of his apartment and was homeless for a time.  He would contact Deveny to let her know of his financial and medical needs, and Deveny would occasionally send him money she had obtained by selling his future settlement to a company that buys structured settlements.  The money AV1 received from Deveny was only a few thousand dollars at a time, and he spent it on rent and other bills.  At one point, Deveny told AV1 that she was able to get him $10,000 from the driver who hit him, and she sent AV1 several checks that amounted to a little more than $10,000.

Several years after the accident, AV1 still suffered from injuries to his brain that altered his life.  AV1 cannot recall most of the events of early 2014.  He broke up with his girlfriend

**Government's Sentencing Memorandum**                                      **Page 7**

because of changes to his temperament brought on by his injuries.  He had difficulty keeping a job and took lower paying jobs because he could not remember things very well.

In October 2018, *after* she had resigned from the Oregon State Bar, Deveny told AV1 that a settlement had been reached in the case.  At the time, Deveny told AV1 that it took her so long to reach the settlement because these types of cases are lengthy, her husband had died, and her mother had been ill.  At the end of October 2018, AV1 signed a settlement agreement for $15,000.  AV1 was expecting to receive more money than this, but Deveny told him to sign the agreement, and that it would take 30 days for her to get the money to him.  AV1 reached out to Deveny several times inquiring about the settlement check, but Deveny ignored his messages. The desperation AV1 felt when dealing with Deveny while trying to cope with his disabilities is reflected in a series of text messages he had with defendant in the Fall of 2018 (Exhibit 5).  The last time AV1 heard from Deveny was on November 13, 2018, when she told him there had been a recent death in her family and that she would get back to him soon.  At no point did Deveny tell AV1 that she had resigned from the Oregon State Bar and could no longer legally practice law.

In December 2018, a law enforcement officer contacted AV1 and told him that Farmers Insurance Company had settled his claim four years earlier in June 2014 for $150,000 and sent the check to Lori Deveny (PSR ¶ 40).  On approximately June 25, 2014, Farmers Insurance Company mailed a check for $150,000 from Pocatello, ID to Lori Deveny's office in Portland, OR (Exhibit 6).  Deveny forged AV1's signature to the check and deposited the funds to her IOLTA account.  Deveny strung AV1 along for four years with excuse after excuse about the settlement, while AV1 struggled to survive.  Over the course of four years, Deveny only paid

approximately $17,300 ($4300 per year) of the $150,000 settlement to AV1 and kept the rest for herself.

Upon learning from the law enforcement officer that Deveny had stolen most of the money he was to recover from the insurance company and the driver, AV1 broke down in tears and said that he felt victimized twice – once by the accident and again by Deveny.

### Counts 2 and 7 – Mail Fraud and Wire Fraud

Adult Victims 2 and 3 (hereinafter AV2 and AV3) are sisters who hired Deveny in 2014 to file a wrongful death lawsuit against Kaiser Permanente after their mother passed away in November 2013 (PSR ¶¶ 41-42).  Pursuant to the retainer agreement, Deveny was to receive thirty-three and one-third of any settlement with Kaiser.  Deveny reported that a settlement of $100,000 had been reached with Kaiser, and on September 25, 2015, AV2 signed a confidential release agreement.  AV2 and AV3 waited for the settlement funds, but they never came.  Deveny lied to AV2 and AV3, telling them that there was a Medicare lien against the estate that had to be satisfied first.  For three years, Deveny continued to make one excuse after the other, and AV2 and AV3 never received any funds from the defendant (Exhibit 7).

Law enforcement investigators learned that Kaiser mailed a $100,000 check to Deveny, and she deposited it to her IOLTA account on October 6, 2015 (Exhibit 8).  According to the retainer agreement, AV2 and AV3 should have received $68,333 from this settlement.  Bank records show that on October 13, 2015, Deveny wired $13,897 from this settlement to Jacques Senekal at African Maximus Safaris as payment for an African safari for her husband and herself.

**Government's Sentencing Memorandum**                                            **Page 9**

**Count 3 – Mail Fraud**

In January 2014, Adult Victim 4 (hereinafter AV4) hired Deveny to represent him after AV4 was involved in an automobile accident (PSR ¶¶ 43-45).  Years passed, and AV4 never received any money from the insurance company.  Deveny always had an excuse for why the company wouldn't make the payment.  AV4 contacted Deveny in August 2018 to ask about his settlement prior to leaving on a trip to Greece. Deveny assured him that the case would settle soon, and that she would send the money to him by the time he returned from Greece.  AV4 never signed any settlement paperwork, and there were no funds from Deveny when he returned from Greece.

Bank records indicate that on December 23, 2015, EMC Insurance issued a check in the amount of $90,000 to Lori Deveny in trust for AV4 and mailed the check to Deveny's Portland office.  Deveny deposited the check to her IOLTA account and used the money for herself.  AV4 should have received $62,000 from the insurance check sent to Deveny.  The settlement documents and the endorsement on the back of the $90,000 check bear the forged signature of AV4.

**Count 4 – Mail Fraud**

Adult Victim 5 (hereinafter AV5) retained Deveny following a car accident that AV5 had in August 2013 (PSR ¶¶ 46-47).  Three years later, in August 2016, Deveny had AV5 sign settlement documents indicating the insurance company would be paying $92,500 on the claim. After AV5 signed the papers, Deveny never paid any of the proceeds from the insurance settlement to AV5.  AV5 repeatedly called Deveny about the money, and Deveny falsely claimed that the insurance company had placed a medical lien on the payment.

Unbeknownst to AV5, Zurich American Insurance Company had mailed a $92,500 check to Deveny's office in August 2016.  Deveny forged AV5's endorsement on the check and deposited it into her IOLTA account.  AV5 should have received $61,666 from the settlement funds.  In order to cover her tracks, Deveny falsely told AV5 that she had convinced the insurance company to release $10,000 to AV5, and in April 2017, Deveny wired $10,000 to AV5 from her business checking account.  Otherwise, AV5 received no additional funds from the insurance settlement.

**Counts 5 and 10 – Mail Fraud and Wire Fraud**

Adult Victim 6 (hereinafter AV6) hired Deveny after he had been in an automobile accident in April 2016 (PSR ¶ 48).  AV6 had surgery related to the accident in March 2017.  Unbeknownst to AV6, Deveny settled his claim with Safeco Insurance for $100,000 before AV6's surgery was billed (Exhibit 9).  AV6 was unaware of the settlement until July 2018, when he learned that Deveny was no longer practicing law and he inquired about the status of his claim.  Safeco provided AV6 with a copy of the check and signed release, and AV6 noticed that the signatures on both documents were forged.  AV6 told investigators that he never received any of the settlement funds from Deveny, and because of his surgery, he owed $50,000 in medical expenses.  AV6 indicated that in April and May 2018, Deveny sent him emails claiming that she was still working on his file (Exhibit 10).   At the time of these emails, the Oregon Bar Disciplinary Counsel's Office had already filed a petition to suspend Deveny from the practice of law, and she was just weeks away from voluntarily surrendering her law license.  Deveny never told AV6 about these events when she claimed that she was still working on his file.

**Government's Sentencing Memorandum**                                                              **Page 11**

Bank records reveal that Deveny deposited the $100,000 Safeco check meant for AV6 to her IOLTA account on May 23, 2017. AV6 should have received $83,333 from his claim. Deveny paid him nothing.

**Count 6 – Mail Fraud**

Adult Victim 7 (hereinafter AV7) retained Deveny in July 2017 after AV7 was involved in an automobile accident (PSR ¶¶ 49-50). On June 10, 2018, after she had submitted her Form B Resignation to the Oregon Bar, Deveny asked AV7 to sign release papers because she had reached a settlement in this case. Deveny told AV7 that when she received the check from the insurance company, she would take her one-third fee and send AV7 the rest. AV7 never received any funds from Deveny, and later learned that she had lost her license to practice law. Bank records reveal that Country Financial Insurance Company mailed a $20,000 check to Deveny in June 2018 in trust for AV7. Deveny deposited the check to her IOLTA account despite no longer being able to practice law. AV7 should have received $13,333 from the settlement.

**Count 8 – Wire Fraud**

Adult Victim 8 (hereinafter AV8), a previous client of Deveny's, retained defendant in 2015 to represent her in an automobile accident case. AV8 kept inquiring about the claim, but Deveny gave excuses as to why the matter was taking so long. AV8 never signed any settlement papers regarding the claim. Time passed with AV8 never receiving any settlement funds.

In September 2018, AV8 was on the Internet and found a story about Deveny being investigated by the Oregon State Bar. Based on the story, AV8 contacted the insurance company

**Government's Sentencing Memorandum**                                                  **Page 12**

to inquire about her claim, but the company representative would not provide her any information.  AV8 learned from a law enforcement officer that in October 2016, Farmers Insurance had issued a check for $10,250 in settlement of her claim.  Unbeknownst to AV8, Deveny had faxed forged settlement papers to the insurance company, obtained the check, and deposited the entire amount to her IOLTA account.  AV8 should have received $6,833 from the settlement, but Deveny kept all the proceeds for herself.

### Count 9 – Wire Fraud

On May 25, 2016, Adult Victim 9 (hereinafter AV9), was involved in a car accident and suffered a traumatic brain injury.  With the help of her father, AV9 hired Deveny to represent her.  After about six months, AV9 checked with Deveny about the progress of her claim against GEICO insurance company, and Deveny told her that she was waiting for GEICO to provide her with information.  AV9 kept calling Deveny about the claim, but she always had excuses for why the matter was taking so long.

In December 2017, Deveny called AV9, told her that they were close to a settlement, and that she should soon be calling her AV9 with good news.  At this point, Deveny was already being investigated by the Oregon State Bar.

Despite the case being close to resolution, Deveny never sent AV9 any settlement documents for her signature.  AV9 waited for the settlement, but it never came.  In August 2018, AV9 realized that it had been a long time since Deveny had called her claiming the case was almost settled.  AV9 did not have Deveny's phone number, so she Googled Deveny's name and an article about defendant's trouble with the Oregon State Bar came up.  AV9 was very concerned about her claim and contacted the insurance company, but representatives would not

give her any information.  AV9 used the insurance company's website to inquire about her case and learned that the company had settled her claim in February 2017 for $50,000.  Deveny had faxed forged settlement documents to the insurance company, and forged AV9's endorsement on the settlement check.  Bank records show that Deveny deposited the $50,000 payment meant for AV9 to her IOLTA account on February 21, 2017 and kept the funds for herself.

### Counts 11 and 13 – Wire Fraud and Aggravated Identity Theft

Adult Victim 10 (hereinafter AV10) retained Deveny to represent her in a lawsuit over an automobile accident that she and her daughter, Adult Victim 11 (hereinafter AV11) had in July 2016 (PSR ¶¶ 51-52).  According to the retainer agreement, Deveny would receive 33 1/3% fee from any settlement and AV10 and AV 11 would receive the remaining amount.  Deveny filed the lawsuit against the other driver's insurance company, Nationwide.  AV10's insurance company paid for her and her daughter's medical expenses.  AV10 often checked in with Deveny about the progress of the case, but Deveny made numerous excuses as to why the case was not progressing.

In June 2018, after she could no longer practice law, Deveny told AV10 that a $10,000 settlement had been reached.  Deveny mailed settlement forms to AV10 for her and AV11's signatures.  AV10 was unhappy with the $10,000 settlement, but Deveny advised that this was all AV10 was going to receive minus Deveny's one-third fee.  AV10 and AV11 signed the settlement papers and sent them back to Deveny on June 5, 2018.  Time passed, and the settlement check never came.  AV10 contacted Deveny about this, and Deveny said she was waiting for AV10's insurance company to provide additional information before the settlement could go through.  After months of waiting for payment, AV10 contacted Nationwide Insurance

Company on October 24, 2018, and learned that the claim had been settled on May 31, 2018, five days *before* AV10 and AV11 received the settlement documents from Deveny, and seven days *after* Deveny submitted her Bar resignation.

AV10 obtained a copy of the settlement paperwork submitted by Deveny to Nationwide. Deveny had forged AV10's signature on a settlement agreement and faxed this forged document to Nationwide to settle the claim (Exhibit 11).  The wire transmission of this forged settlement document forms the basis of defendant's guilty plea to Count 11 and Count 13 of the Indictment.

On May 31, 2018, Nationwide issued a check for $14,024.11 made payable to AV10 and the law offices of Lori Deveny, and a check for $6500 made payable to AV11 and the law offices of Lori Deveny (Exhibit 12).  AV10 indicated that the endorsements on the back of the checks are neither her signature nor her daughter's signature.  Defendant deposited these insurance proceeds to her IOLTA account, kept all the money for herself and paid nothing to AV10 or AV11.  Deveny "settled" the claim when she was no longer eligible to practice law.  AV10 should have received $9349 from the settlement and her daughter, AV11, should have received $4333.55.

**Counts 14, 15, 16 and 17 – Bank Fraud; Aggravated Identity Theft; Money Laundering**

AV12 had an attorney-client relationship with Deveny in 1996, when defendant successfully handled a workman's compensation claim for AV12.  Sometime prior to September 2017, AV12 had two hip replacements that failed and she asked Deveny to represent her in a case against the medical device manufacturers (PSR ¶¶ 53-57).  Deveny did not handle faulty

medical device cases and referred AV12 to a Lake Oswego, Oregon attorney who specialized in these types of cases.  Deveny received a $9,000 referral fee from the Lake Oswego attorney.

Eventually, AV12's two cases against the medical device manufacturers settled.  When the first case settled, the Lake Oswego attorney who represented AV12 sent her a check for the proceeds without any issues.  Sometime later, the second case settled for $55,629.01, but the Lake Oswego attorney had difficulty locating AV12, who had moved out of state.  The Lake Oswego attorney asked Deveny if she had any contact information for AV12, and Deveny told him he that she could deliver the settlement check to AV12, since AV12 was going to be in Portland and would be stopping by Deveny's office.  The Lake Oswego attorney thanked Deveny and mailed to her, the $55,629.01 law firm check and paperwork for AV12 to sign.  The Lake Oswego attorney told investigators that he thought things were fine because he saw that the check had cleared his account in September 2017.

Investigators found that a check in the amount of $55,629.01 from the Lake Oswego attorney's law firm made payable to AV12 was deposited to Lori Deveny's IOLTA account on September 19, 2017 (Count 15).  The check should not have been negotiated by Deveny, and the back of the check read "For Deposit Only [AV12]".

During the pendency of her faulty medical device cases, AV12 was in contact with Deveny and sent her messages asking why she thought her case was taking so long.  Deveny told her that these types of cases can take time.  Between November 2017 and September 2018, Deveny emailed AV12 several times to assure her that the second settlement check would be coming soon.  Deveny stopped responding to AV12's messages in November 2018.  AV12 contacted the Lake Oswego attorney on December 12, 2018, and said that Deveny would not

release the settlement money to her.  The Lake Oswego attorney knew immediately that something was wrong because the check should have gone straight to AV12 and not to Deveny's IOLTA account.  The Lake Oswego attorney contacted the Oregon State Bar about this chain of events.

AV12 told investigators that she was not aware of the check or that the check and paperwork had been sent to Deveny.  AV12 had not visited Portland in September 2017, and she never received any funds from Deveny.  AV12 indicated that the endorsement on the back of the check is not her signature.  Investigators determined that Deveny forged AV12's name and signature on the stolen check (Count 15).  Bank records show that on September 20, 2017, the day after AV12's $55,629.01 check cleared Deveny's IOLTA account, Deveny made a $26,000 ACH transfer to pay her American Express account (Count 16).  On September 22, 2017, Deveny made a payment of $20,976.36 on a business loan she had taken with Alliance Legal Solutions.  (Count 17)

Wells Fargo Bank suffered a loss of $55,629.01 as the result of Deveny's theft and forgery of AV12's check.

**Counts 18 and 19 – Making and Subscribing a False Federal Income Tax Return**

Deveny filed a 2011 U.S. Individual Income Tax Return on May 10, 2013, in which she claimed gross receipts of $244,098.  Deveny knew this amount was false, because she failed to report on her federal tax return, $180,236 of income that she embezzled from her clients in 2011 (Count 18).

On May 10, 2013, Deveny filed a U.S. Individual Income Tax return for 2012 on which she claimed gross receipts of $227,772.  Deveny knew this amount was false because she failed

**Government's Sentencing Memorandum**                                            **Page 17**

to report on her federal tax return, $233,840 of income that she embezzled from her clients in 2012 (Count 19).

### Counts 20 through 24 – Failure to File Tax Returns

Defendant Deveny failed to file Federal Income Tax Returns for the calendar years 2013, 2014, 2015, 2016 and 2017 despite being required to do so.  Deveny's unreported gross receipts for these years were as follows:  $556,862 for 2013; $496,733. for 2014; $523,526.56 for 2015; $458,800 for 2016; and $575,548 for 2017.

The IRS determined that between 2011 and 2017, Deveny had unreported gross receipts of $3,025,545.56, resulting in additional tax due and owing of $621,137.00.

### C.  Relevant Conduct

Defendant Deveny's larcenous behavior began prior to the events outlined in the Indictment.  An investigator for the Oregon State Bar Client Security Fund (CSF) investigated a claim made against Deveny by the attorneys for Adult Victim 13 (hereinafter AV13), a previous Deveny client.  The CSF investigator uncovered a series of events involving Deveny's theft of settlement funds from disabled AV13 beginning in 2002 and continuing into the years covered by the Indictment (Exhibit 17).

Sometime prior to 2002, AV13 hired defendant Deveny to represent him in a workmen's compensation claim arising out of an incident that left him disabled for life, and in a condition that made it difficult for him to understand his financial affairs.  AV13, a veteran, suffered from a series of health issues including traumatic brain injury, severe memory loss, dizziness, headaches, loss of depth perception, and cognitive dysfunction.  The workmen's compensation

claim settled in 2002 for a total of $1,209,750, which was net of Deveny's $140,250 fee.  The checks for the settlement were sent to Deveny's law firm.

Deveny established a bank account at Washington Mutual Bank (WAMU) under the name "AV13 Trust" and named herself as trustee and AV13 as trustor.  Deveny was the sole signer on the account.  The CSF investigator had access to Deveny's client files after she resigned from the practice of law, and he reviewed them as part of his investigation (Exhibit 17). He determined that although some bank records were missing, the entire amount of the $1,209,750 appeared to have been deposited to the WAMU account, which was not an IOLTA account.  The CSF investigator never located a trust document among Deveny's files.

After she opened the WAMU account, Deveny purchased an annuity from Pacific Life insurance for $900,000, made payable to AV13.  It is unclear what happened to the remaining $309,750 from the settlement, but Deveny has never made an accounting of it.  The terms of the annuity were that AV13 was to receive $5069.54 per month for life, with a guaranteed minimum payment of 300 months, running from October 2002 to September 2027.  At the time of the settlement, AV13 was in residential care that cost $7,000 per month.

AV13 was released from residential care in November 2003.  At the time, 16 payments of the monthly annuity of $5,069.64 had been made to the WAMU account.  When he was released from residential care, AV13's monthly expenses dropped significantly.   Deveny, as alleged trustee, then liquidated AV13's right to receive the following 120 months of guaranteed annuity payments by making an assignment dated November 25, 2003, to First Providian in Florida. First Providian paid $324,495.29 to Deveny to liquidate this portion of AV13's annuity, which would have been payable to him from February 2004 through January 2014.  In January 2004,

Deveny instructed First Providian to route the $324,495.29 payment to her IOLTA account rather than the WAMU account. Deveny never made an accounting of these funds.

On November 16, 2007, Deveny, purporting to act again as trustee for AV13, arranged a second, similar assignment to First Providian to liquidate AV13's right to the remaining 164 months of guaranteed payments from Pacific Life. First Providian paid Deveny $230,000 for AV13's right to receive guaranteed monthly payments for the period February 2014 through September 2027. Deveny has never accounted for these funds. AV13 signed documents agreeing to these sales of his annuity, but because of his memory loss and cognitive dysfunction, it is highly unlikely that he knew what he was signing.

Most of the income that came into the WAMU account held for AV13's benefit was from AV13's social security payments and veteran's benefits. During the time AV13 was a client, Deveny paid all his bills. AV13 had to go to Deveny's office to pick up his small monthly allowance. Sometimes he would do some work around Deveny's office, and she would "pay" him with food or rolls of quarters. AV13 had requested that Deveny discuss his financial affairs with his family, but Deveny told him she didn't want to talk with his mother because she and AV13's mother did not get along.

When the CSF investigator interviewed AV13 in October 2021, he said that Deveny never reviewed the terms of the workmen's compensation settlement with him. She always seemed as though she was in a hurry and took other client calls when he went to her office to confer with her. Deveny never gave him sufficient time to read documents, but just had him sign them. AV13 could not recall what documents he may have signed, did not know what an

annuity is, had no knowledge that any part of his funds were used to purchase an annuity, and had no knowledge that Deveny assigned his rights in an annuity to a third party.

The government believes that defendant's actions with respect to AV13 are relevant conduct in this case. The annuities defendant sold would have paid AV13 until 2027, well into the period outlined in the Indictment. Although her representation of AV13 began in 2002, it is apparent that Deveny's criminal behavior predated the period set forth in the Indictment (at least April 2011 through May 7, 2019). Deveny used familiar tactics she used during the Indictment period, i.e., lying, trickery, and manipulation, to cheat AV13 out of his $1.2 million workmen's compensation settlement. Deposits of AV13's funds from the third-party purchaser of the annuity went into Deveny's IOLTA account, not the account set up in trust for AV13. Most likely, defendant kept the bulk of the money for herself.

Defendant has admitted that in approximately 2006 and 2007, she realized she could not pay her family's bills, and began stealing money from her clients (PSR¶ 101b).

The CSF determined that it would pay $100,000 to AV13 as partial payment for the loses he suffered as the result of Lori Deveny's fraudulent conduct. The government believes that AV13 is also entitled to the remaining $1.1 million as restitution under 18 U.S.C. § 3663A (Exhibits 14, 17).

**D.  Use of Client Funds**

Over the course of the scheme, Deveny stole more than $3.8 million from at least 135 of her clients (PSR ¶¶ 62-65). Besides being a lying, manipulative thief, Deveny was a relentless spendthrift. An analysis of Deveny's bank and credit card records reflects the unbridled and decadent spending that Deveny and her husband Robert engaged in over the years. More than

$3.5 million passed through their checking accounts from 2011 through 2018. Deveny and Robert spent more than $1.7 million paying their American Express bills. Those bills, along with withdrawals from their checking accounts, reflect some of the extravagant purchases they made: $150,000 on airline tickets to places like Johannesburg, South Africa; Mexico City, Mexico; Winnipeg, Canada; Palm Springs, CA; Phoenix, AZ; Juneau, Alaska; Las Vegas, NV; Reno, NV; Orlando, FL; and Dallas, TX; more than $173,000 on African safari trips with Jacques Senekal and African Maximus Safaris; $35,000 in taxidermy expenses; more than $125,000 on home renovations that included a dog kennel, cigar room and new roof; more than $195,000 in mortgage payments; nearly $160,000 to Vlakvark Media LLC, Robert Deveny's photography business/hobby; $58,000 on pet boarding and veterinary costs; over $41,000 on RV expenses; payments on a $50,000 2016 Cadillac SRX; more than $220,000 in purchases with Broadway Cigars; more than $60,000 spent on stays at the Desert Sun Resort, a Palm Springs luxury nudist resort; $6500 for a Princess cruise; and an $18,000 stay at Wollaston Lake Lodge, a fishing resort in Saskatoon, Saskatchewan, Canada.





Photo of Lori Deveny and Jacques Senekal standing amongst multiple taxidermy hunting trophies. (Source: Internet)



Desert Sun Resort, Palm Springs, CA





2016 Cadillac SRX



Princess Cruise Ship

**Government's Sentencing Memorandum**                                        **Page 24**



Wollaston Lake Lodge, Saskatoon, Saskatchewan, Canada



Vlakvark Media LLC photo
(Source: Internet)

### E.  Other Victims and the Impact of Defendant's Crime

As noted above, Deveny defrauded at least 135 former clients out of more than $3.8 million.  Many of these victims filed complaints with the Oregon State Bar and received reimbursement for portions of their losses by the Client Security Fund (CSF).  We have not included all their stories here, because the volume is so great.  Their experiences with Lori Deveny are hauntingly familiar.  Many of these clients had devastating injuries from automobile and other accidents.  Some had severe cognitive impairment and had difficulty managing their financial affairs.  Deveny promised honest representation to obtain insurance settlements for these injured clients.  Deveny relentlessly lied and manipulated these clients into believing she was diligently working on their behalf.  Deveny forged documents and stole identities in order to keep all the proceeds of the insurance payouts for herself.   Then Deveny spun lie after lie about the settlements in order to appease victims who were asking questions about their funds.  Many of these clients told desperate stories about needing the money for living expenses or for medical needs.

Attached are some letters and emails written by the victims in the case, recounting the impact that Deveny's theft, lies, deceit and manipulation had on them (Exhibit 16).

### F.  Other Victims and Restitution

In a letter from Ankur H. Doshi, General Counsel for the Oregon State Bar, Mr. Doshi indicates that the Oregon State Bar Client Security Fund (CSF) paid a total of $1,242,673.60 to the 135 clients who made claims (PSR ¶ 63) (Exhibit 13).  Consequently, restitution in this amount is due to the CSF.  Mr. Doshi stated that two claims totaling $130,338 are still pending before the CSF.  According to Mr. Doshi, Oregon State Bar active attorneys fund the CSF

through an annal fee assessment that is set based on claims paid by the CSF.  The payments made to Deveny's former clients were quite substantial and were some of the largest payments made by the CSF against a single lawyer.  As a result of these large payments, the CSF was required to raise the 2018 assessment to Bar members from $10 to $15 per member.   The assessment increased to $50 per member in 2019 to restock the CSF reserve.[4]

Despite the CSF paying $1,242,673.60 to Deveny's former clients, these individual client victims are still owed restitution in the amount of $2,642,459.32 as the result of defendant's fraudulent schemes (PSR ¶ 62; Exhibit 14).

Deveny committed Bank Fraud against Wells Fargo Bank when she deposited the forged $52,620.36 law firm check made payable to AV12.  Since the Bank took the loss, Deveny owes restitution to Wells Fargo Bank in the amount of the forged check (PSR ¶ 64; Exhibit 14).

The Internal Revenue Service suffered a tax loss of $621,137.00 based on unreported gross receipts of $3,025,545.56 for the years 2011 through 2017.  Defendant should be ordered to pay restitution to the IRS in this amount (PSR ¶ 65; Exhibit 14).

Total restitution due to all victims in the case amounts to $4,558,889.28 (Exhibit 14).  After the sentencing, the government will submit a chart with the names and contact information of the victims along with the specific amounts of restitution each is owed.

## IV.    THE PLEA AGREEMENT AND GUIDELINE COMPUTATIONS

### A.  The Plea Agreement Guideline Computation (PSR ¶¶ 15-32)

Deveny's guilty plea was entered pursuant to a written plea agreement.  The Court is not bound by the recommendations of the parties or the presentence report.  Deveny may not

[4] The fee was dropped to $30 per member in 2021.

**Government's Sentencing Memorandum**                    **Page 27**

withdraw her guilty plea or rescind the plea agreement if the Court does not follow the plea agreement or the recommendations of the parties.

The parties agreed that the following United States Sentencing Guidelines ("Guidelines") provisions applied to Counts 1, 11, 14 and 16:

| | Guideline Provision | Levels |
|---|---|---|
| A. | Base Offense Level[USSG § 2Bl.l(a)(l), § 2S1.1(a)(1)] | 7 |
| B. | Loss of More than $1,500,000 [USSG § 2Bl.l(b)(l)(J)] | 16 |
| C. | Ten or More Victims [USSG § 2Bl.l(b)(2)(A)(i)] | 2 |
| D. | "Sophisticated means" [USSG § 2B1.1(b)(10)(C)] | 2 |
| E. | Money Laundering [USSG § 2S1.1(b)(2)(A)] | 1 |
| F. | Vulnerable Victim [USSG § 3A1.1(b)(1)] | 2 |
| G. | Large Number of Vulnerable Victim [USSG § 3A1.1(b)(2)] | 2 |
| H. | Abuse of Position of Trust [USSG § 3Bl.3] | 2 |
| | **Adjusted Offense Level** | **34** |

The parties also agreed that the following United States Sentencing Guidelines provisions applied to Count 19 of the Indictment:

| | Guideline Provision | Levels |
|---|---|---|
| A. | Base Offense Level [ §2T1.1, 2T4.1(H)] | 20 |
| B. | Illegal Source over $10,000 [§2T1.1(b)(1) | 2 |
| | Adjusted Offense Level | **22** |

The parties agreed that the fraud charges in Counts 1, 11, 14, and 16 were not to be grouped with the false tax return charge in Count 19, and consequently, the multiple count adjustment under USSG § 3D1.4 applied. The parties agreed that under USSG § 3D1.4(a), one level would be added to the group of counts with the highest Offense Level, resulting in a Total Adjusted Offense Level of 35 (34 +1= 35).

Pursuant to the plea agreement, the government agreed that with respect to Counts 1, 11, 14 and 16, it would recommend a three-level reduction for acceptance of

**Government's Sentencing Memorandum**                    **Page 28**

responsibility, and a two-level downward adjustment for the factors set forth in 18

U.S.C. § 3553.  This resulted in a guideline range of 97-121 months, assuming no

criminal history.  The government would recommend a low-end sentence of 97 months

on Counts 1, 11, 14, 16 and 19.  In addition, the government would recommend that

the defendant serve a mandatory prison term of 24 months on the conviction for Count

13, consecutively to the sentence imposed on Counts 1, 11, 14, 16 and 19.  The

government also agreed to recommend that the sentence on Count 15 run concurrently

to the mandatory 24-month sentence the Court imposes for Count 13 and with any

sentence imposed on Counts 1, 11, 14, 16 and 19.  This would result in the

government's total recommended prison sentence of 121 months.  Under the plea

agreement, the defendant cannot ask for a sentence lower than 60 months in prison

(ECF No. 38 at ¶¶ 9-14).  The Court is not bound by the recommendations of the

parties or of the presentence writer (ECF No. 38 at ¶15).

### B.  The PSR Calculation (PSR ¶¶ 69-91)

The PSR author calculated the applicable guideline range similarly to the

way the parties calculated it in the plea agreement, coming up with an Adjusted Offense

Level of 34 (29 (Base Offense Level) + 1 (Money Laundering) + 2 (Large Number of

Vulnerable Victims) + 2 (Abuse of a Position of Trust) = 34), (PSR ¶¶ 71-76).

However, the PSR writer determined that no increase in the offense level under the

Multiple Count Adjustment provisions of USSG §3D1.4 was warranted, because the

non-grouped tax offenses had an adjusted offense level that was more than 9 levels less

serious than the group of counts with the highest offense level.  (PSR ¶¶ 78-87).

**Government's Sentencing Memorandum**                                      **Page 29**

Consequently, the PSR author determined that the Adjusted Offense Level is 34, not 35 (PSR ¶ 87). The government will abide by the decision of the PSR writer with respect to this issue.

The PSR writer determined that three-levels off for acceptance of responsibility under USSG §3E1.1 (a) and (b) was appropriate, resulting in a Total Offense Level of 31 (PSR ¶¶ 89-91). With two additional levels off for consideration of the factors set forth in 18 U.S.C. §3553, the recommended Offense Level is 29, and the resulting guideline range for counts 1, 11, 14, 16 and 19 is 87-108 months in prison (PSR ¶ 113; Sentencing Recommendation Page). The mandatory consecutive sentence of 24 months should be imposed on the Aggravated Identity Theft conviction in Count 13 (PSR ¶ 77; Sentencing Recommendation Page). This results in a total custodial sentence of 111 months in prison.

## V.    GOVERNMENT'S SENTENCING RECOMMENDATION

### A.  Overview

The government agrees with the PSR author's sentencing recommendation of 87 months on the fraud, tax and money laundering charges (Counts 1, 11, 14, 16 and 19) and a mandatory consecutive sentence of 24 months on the Aggravated Identity Theft conviction in Count 13, for a total prison term of 111 months. As noted above, defendant is prohibited by the plea agreement from asking for a sentence of less than 60 months in prison. The government believes that a total sentence of 111 months is appropriate, just and not greater than necessary to achieve the goals of sentencing.

In fashioning an appropriate sentence, the Court should consider the factors listed under 18 U.S.C. § 3553(a) and decide whether they support the sentence advocated by the parties.

*United States v. Carty*, 520 F.3d 984,991 (9th Cir. 2008) (citing *Gall v. United States*, 128 S.Ct. 586, 596-97 n. 6(2007); 18 U.S.C. §§ 3553(a)(1)-(7)). Factors the Court should consider include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to reflect: (1) the seriousness of the offense; (2) respect for the law; (3) just punishment for the offense; (4) adequate deterrence to criminal conduct; (5) protection of the public from further crimes of the defendant; and (6) providing the defendant with needed training, care or treatment.

Because the aggravating factors far outweigh any mitigating factors, the circumstances of defendant's case do not support an exercise of leniency.

### B. Nature and Circumstances of the Offenses (18 U.S.C. § 3553(a)(1)

Defendant Deveny's crimes are extremely serious and totally reprehensible. She was a sworn member of the Oregon State Bar and an officer of the Court when she committed her fraudulent schemes. As a member of the Oregon State Bar, defendant was obligated to comply with Oregon Rules of Professional Conduct. Under these rules, Deveny was required, among other things, to attend to legal matters on behalf of her clients, to refrain from making knowing, dishonest, fraudulent, and deceitful or false statements, or engaging in dishonest, deceitful conduct during the course of representing her clients.

Deveny failed miserably in her duty to her clients. She created an intricate web of theft, lies, deceit, false promises and manipulation. With respect to the mail and wire fraud schemes, Deveny inflicted tremendous harm on dozens and dozens of her former clients. Most of these victims were extremely vulnerable during the course of defendant's crimes. Victims recounted these harms to law enforcement officials and have submitted victim impact letters and emails

that further describe the financial and emotional harm defendant caused over the course of many years, the deleterious effects of which will endure for years to come. Some of the victims of Deveny's crimes will be in the courtroom at sentencing to give their impact statements. The emotional damage defendant unleashed on her victims is particularly acute, because defendant stole from clients who had turned to her for help addressing harms that they had already suffered. These vulnerable clients put their trust in Deveny and relied on her to represent their interests when many of them literally were physically broken. Some of these clients had severe brain injuries that affected their cognitive abilities every minute of every day. They couldn't work, they had difficulty remembering things, and they needed months and months of medical attention. Some had surgeries to repair physical injuries and were later stuck with large medical bills because defendant stole their settlements. Deveny took advantage of her victims' brain impairments because she knew that some of her clients would not remember if they had signed documents or received insurance payouts.

Rather than honor her obligations and fulfill her legal, professional and ethical duties, Deveny stole from her clients for more than a decade. She strung them along and lied to them for months and in some cases years, fabricated documents, forged their names on documents and checks, and went to great lengths to conceal her fraud. She not only stole from her clients, but she also cheated a federally insured bank out of more than $55,000 and evaded the payment of more than $621,000 in taxes on her ill-gotten gain.

Deveny did not commit these crimes to support her family or pay for an urgent medical procedure. She has no arguable mitigating reason for her conduct. To the contrary, Deveny's own avarice was at the heart of her crimes. Defendant stole from her clients so that she could

remodel her house, pay her mortgage, indulge her husband's photography hobby, smoke fine

cigars in her custom-built cigar room, drive a luxury vehicle, stay at a luxury nudist resort, go on

luxury fishing trips, purchase guns, travel the world, and hunt wild animals on several African

safaris. Deveny stole in order to live an extravagant lifestyle that many people only dream about,

while leaving her victims desperate and either destitute or barely able to make ends meet.

### C.   The History and Characteristics of the Defendant

Lori Deveny came to commit these crimes as a privileged individual. She enjoyed

significant advantages, including a "fantastic childhood," "loving parents," a middle-class

upbringing, a first-rate legal education and a thriving professional career (PSR ¶¶ 100a, 100b).

For a time, she was the president of the Oregon Women's Lawyers bar association and was a

respected member of the local legal community.

Defendant Deveny's criminal conduct arose from calculated choices that resulted in

multiple blatant and egregious violations of the trust placed in her by her clients over the course

of many years. She made conscious choices to repeatedly commit deplorable crimes that harmed

a large number of vulnerable victims over a lengthy period of time. The malevolence of

defendant's actions is magnified by the undisputed fact that Deveny did not need to do what she

did.

Defendant's default explanation is to blame her deceased husband. Deveny describes her

husband as physically, emotionally and sexually controlling. She indicates that her husband was

depressed, hid guns around the house, and liked to spend a lot of money collecting various

objects. He also liked to take African safaris that defendant accompanied him on (PSR ¶ 101a).

In order to deal with her husband's spendthrift behavior, Deveny began stealing from her clients,

which she admits she started in 2006 and 2007 (PSR ¶ 101b).  Portraying herself as merely trying to manage her husband's wild spending, Deveny claims that the thefts were her deceased husband's idea, not hers.  Purportedly, Robert Deveny claimed that the thefts were "no big deal" and that they would eventually pay the money back (PSR ¶ 101b).   Deveny realized in 2016, that the alleged repayment plan would fail because complaints were being made by clients to the Oregon State Bar.

Defendant's attempts to portray herself as a victim of her husband's weird sexual proclivities and avarice are unavailing.  It makes little sense that she would turn to stealing from her clients because of her husband's strange sexual practices.  One thing simply has nothing to do with the other.  Moreover, defendant did not curtail her larcenous ways after her husband committed suicide in March 2018.  There are multiple incidents occurring months after her alleged tormentor died where Deveny created phony settlement documents, forged clients' signatures on checks, deposited the stolen funds to her IOLTA account, and used the money for herself.  Surely once her husband was gone, the reason for the thefts evaporated, yet defendant just kept on stealing.  Defendant was not driven to commit her crimes by financial need, desperation, the inability to legitimately make a living, or the demands of an abusive husband. Deveny was driven by unadulterated and unbridled greed.

### D.  Respect for the Law; Just Punishment for the Offense; Adequate Deterrence and Protection of the Public

The Court must consider a sentence that promotes respect for the law, just punishment for the offense; adequate deterrence; protection of the public.

Defendant Deveny's criminal conduct harmed at least 135 of her former clients, the Oregon State Bar CSF, Wells Fargo Bank, and the Internal Revenue Service.  Her crimes were

devastating to her clients and others.  She is a thief who stole clients' much needed insurance settlements, their identities, and their sense of well-being.  She wreaked havoc with peoples' emotions and their lives.  The desperation her clients felt during the time defendant was stealing from them can be heard in their letters and statements to the Court.  Lori Deveny is an unfeeling financial predator who stopped at nothing to satisfy her own greed.  Deveny showed no respect for her clients, the law, or the legal system when she engaged in her fraud and identity theft schemes.  The public's faith in the fundamental fairness and integrity of our legal system is shattered when an attorney like Deveny engages in criminal conduct of this nature.  Her claims that she was a pawn in her husband's scheme to acquire spending money are unpersuasive, particularly since she continued her larcenous behavior long after he passed away.

A sentence of 87 months on the fraud, tax and money laundering convictions and a mandatory consecutive 24-month sentence on the aggravated identity theft charges will send a message to Deveny that such behavior won't be tolerated.  A combined sentence of 111 months will also send a message to the public that an attorney's criminal transgressions are taken seriously and won't go unpunished.  Finally, imposing a sentence of 111 months will deter other attorneys from engaging in fraudulent schemes with clients' money and send a message to them that such transgressions will incur serious consequences.

## VI.    RESTITUTION

Restitution in this case is governed by the Mandatory Victim Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A, which requires a district court to "order a defendant to make restitution to a victim of certain specified offenses."  *United States v. Eyraud*, 809 F.3d 462, 466

(9th Cir. 2015).  Charges to which defendant plead guilty, Mail Fraud, Wire Fraud and Bank

Fraud, qualify as crimes requiring this Court to order mandatory restitution.

  The amount of restitution is limited to the victim's "actual losses" that are the direct and

proximate result of the defendant's offenses."  *Id*. citing *United States v. Hunter*, 618 F.3d 1062,

1064 (9th Cir. 2010).  The primary and overarching goal of the MVRA "is to make victims of

crime whole, to fully compensate theses victims for their losses, and to restore these victims to

their original state of well-being."  *United States v. Gordon*, 393 F.3d 1044, 1053 (9th Cir. 2004)

(internal quotations and citations omitted).

  In the instant case, defendant Deveny has agreed pursuant to the plea agreement to pay

restitution for all losses caused by her conduct, including losses caused by relevant conduct,

regardless of whether the conduct was charged in the Indictment, or whether counts of the

Indictment dealing with such losses were dismissed (ECF No. 38 at ¶¶ 19-20 (B)).  The losses

caused by Deveny's criminal conduct are set forth in the chart attached as Exhibit 14.  This chart

reflects the following amounts of restitution owed to the client victims, Wells Fargo Bank, the

Internal Revenue Service and the Oregon State Bar Client Security Fund (CSF):

  The unreimbursed losses to the client victims in this case are $2,642,459.32.

  Wells Fargo Bank suffered a loss of $55,629.01 as the result of Deveny's theft and

forgery of the law firm check made payable to AV12.

  The IRS determined that between 2011 and 2017, Deveny had unreported gross receipts

of $3,025,545.56, resulting in additional tax due and owing of $621,137.00.

The Oregon State Bar Client Security Fund (CSF) paid a total of $1,242,673.60 to the 135 clients who made claims (Exhibit 13).  Consequently, restitution in this amount is due to the CSF.

Total restitution owed to all victims in the case is $4,558,889.28 (Exhibit 14), and pursuant to the plea agreement, defendant Deveny has agreed to pay this amount.

**VII.    CONCLUSION**

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 87 months in prison on Count 1, Mail Fraud, in violation of 18 U.S.C. § 1341; Count 11, Wire Fraud, in violation of 18 U.S.C. § 1343; Count 14, Bank Fraud, in violation of 18 U.S.C. § 1344; Count 16, Engaging in Monetary Transactions With Criminally Derived Property, in violation of 18 U.S.C. § 1957; and Count 19, Filing a False Federal Income Tax Return for the calendar year 2012, in violation of 26 U.S.C. § 7206(1).  In addition, the government requests that the Court sentence defendant to 24 months in prison on Count 13 Count 13, Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; and Count 15, Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A to run consecutively to the sentence on Counts 1, 11, 14, 16 and 19, and to run concurrently with one another.

Finally, the government recommends that the Court impose a three-year term of supervised release, a special fee assessment of $700.00, and restitution in the amount of $4,558,889.28.  The government will ask the Court to detain defendant Deveny at the end of the sentencing hearing.

Dated: January 4, 2023.                              Respectfully submitted,

                                                     NATALIE K. WIGHT
                                                     United States Attorney


                                                     */s/ Claire M. Fay*
                                                     CLAIRE M. FAY, DCB #358218
                                                     Assistant United States Attorney

**Government's Sentencing Memorandum**                              **Page 38**