**Mark P. Ahlemeyer, OSB No. 095997**
**Office of the Federal Public Defender**
**101 SW Main St. Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: mark_ahlemeyer@fd.org**

**Attorney for Defendant**


### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON


| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:19-cr-00183-MO** |
| **Plaintiff,** | **DEFENDANT'S** |
| | **SENTENCING MEMORANDUM** |
| **v.** | |
| **LORI E. DEVENY** | |
| **Defendant.** | |

Ms. Deveny will appear before this Court on January 9, 2023, for sentencing upon her plea of guilty to Count 1—Mail Fraud, in violation of 18 U.SC. § 1341, Count 11—Wire Fraud, in violation of 18 U.S.C. § 1343, Count –13 and 15 – Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A, Count 14—Bank Fraud, in violation of 18 U.S.C. § 1344**,** Count 16—Engaging in Monetary Transactions with Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957, and Count 19—Filing a False Federal Income Tax Return for the Calendar Year 2012, in violation of 26 U.S.C § 7206(1).

**Page 1 - DEFENDANT'S SENTENCING MEMORANDUM**

For the reasons stated below and that will be presented at sentencing, the defense respectfully requests that the Court order a sentence of sixty months' imprisonment with a three-year term of supervised release to follow.

## APPLICABLE LAW

Federal sentencing is premised on the "parsimony principle" articulated in 18 U.S.C. § 3553(a).  *Dean v. United States*, 137 S.Ct. 1170, 1175 (2017).  That principle dictates that a sentence be "sufficient, but not greater than necessary," to comply with the following purposes of sentencing:

- To reflect the seriousness of the offense;

- To afford adequate deterrence to criminal conduct;

- To protect the public from further crimes of the defendant; and

- To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In arriving at a sentence that is sufficient but not greater than necessary, § 3553(a) also requires a court to consider the nature and circumstances of the offense, the history and characteristics of a defendant, the kinds of sentences available, the need to avoid unwarranted disparities among defendants with similar records who are convicted for similar conduct, and the sentencing range established by the advisory United States Sentencing Guidelines. 18 U.S.C. § 3553(a)(1), (3)-(7); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *United States v. Booker*, 543 U.S. 220 (2005).

**Page 2 - DEFENDANT'S SENTENCING MEMORANDUM**

## SENTENCING RECOMMENDATION

Here, there are no disputes about the applicable guideline range and the presentence report correctly calculates both the final offense level and Ms. Deveny's criminal history. However, when considering all the factors listed in 18 U.S.C. § 3553(a), the defense submits that a 60-month sentence of imprisonment is punishment that is sufficient, but not greater than necessary.

**I.    The Nature and Circumstances of the Offense, and the History and Characteristics of the Defendant, Support the Requested 60-Month Sentence.**

Prior to the public revelation of Ms. Deveny's criminal conduct, she appeared to those who met her as an intelligent, competent, and successful litigator, who was happily married to another attorney, Bob Deveny. After Ms. Deveny resigned from the Oregon State Bar and her criminal conduct was publicized, she was instead cast as a greedy pariah who stole from clients without a care to fund her own lavish lifestyle. Neither narrative is true. The truth, as described below and in an accompanying exhibit, is far more complex and involves a fundamentally good person straying from who she was in an attempt to maintain a relationship that, paradoxically, to any objective observer would appear abusive, manipulative, and toxic.

Ms. Deveny was an only child who grew up in Eugene, Oregon. She and her parents were members of the Church of the Nazarene, and Ms. Deveny was active in Christian youth groups. From a young age, this experience shaped her motivation to find a career where she could help others in need. She was driven to be a good student and a hard worker, and prior to the age of 13, she was already working in her father's ice cream business.

In other ways—especially with regard to dating and developing normal and healthy interpersonal relationships with potential partners—Ms. Deveny's growth was stunted. She was "not comfortable in [her] own skin," and was "a little awkward, nervous and self-conscious around

people." Ex A at 8. She viewed herself as "overweight and not physically attractive." *Id.* She did not have any long term boyfriends while growing up and was never in a serious relationship prior to her marriage.

Ms. Deveny's focus was solely on academics and church activities. She was the valedictorian of her high school class and won awards for her debate and speech skills. By her sophomore year, she already knew she wanted to be a lawyer. She went straight from high school to a private, Christian college, Northwest Nazarene, in Nampa, Idaho. There she completed her studies in only three years and was, immediately thereafter, accepted to Willamette University College of Law.

With respect to her social development, Ms. Deveny's college experience was largely the same as high school. She was "dismayed that she had only two dates during her undergraduate years," with one of those dates being with a friend whose actual date "dropped out at the last minute." *Id.* at 9. As she returned to Oregon to become the youngest member of her law school class, Ms. Deveny was intent on finding a level of social inclusion that had so far escaped her.

Two weeks into law school, Robert "Bob" Deveny entered her life. He was also a first-year law student, but he was 16 years older than her, had two children already, and was in the midst of an acrimonious divorce. Ms. Deveny was "flattered that he paid attention to her" and considered him "far out of [her] league" in terms of being a romantic partner. *Id.* In contrast "to her concerns about her social life in her undergraduate years," Bob made Ms. Deveny feel "valued and special." *Id.* At the same time, however, Bob Deveny began laying the foundation of what would become consistent manipulation of Ms. Deveny's emotions and insecurities to ensure she behaved in the way he desired. *Id.* at 10.

**Page 4 - DEFENDANT'S SENTENCING MEMORANDUM**

Ms. Deveny had essentially no sexual experience with a romantic partner when she began dating Bob Deveny. While Bob already had children, Ms. Deveny was a virgin. According to Bob Deveny's therapist, Dr. Peterson, this was not a coincidence: "Dr. Peterson believed Bob began the relationship with Ms. Deveny because he could control her and enjoyed being a 'teacher' to a naïve and sexually inexperienced woman." *Id.* at 19. This desire for "control"—sexually and otherwise—was an overwhelming feature of their marriage up until Bob's suicide in 2018.

Bob Deveny appeared to manipulate and control Ms. Deveny through a "consistent carrot-and-stick strategy: when she displeased him, he gave her a cold shoulder or threatened to leave the relationship but, when she acquiesced to his wishes, he gave her compliments and positive attention. *Id.* at 10. Over time, he began to control many aspects of Ms. Deveny's life, including her food intake, her hair color, and her clothing choices. *Id.* He caused her to be somewhat socially isolated from others and prevented her from having close, trusted friends. But nowhere did his manipulation and control exert itself as much as it did in what should have been the most intimate and safe location in the world for Ms. Deveny—their marriage bed.

Dr. Peterson has described many of "Bob's actions toward Ms. Deveny as abusive." *Id.* at 20. According to her, "[t]heir sexual relationship included a lot of pain. He hurt her, knew he was hurting her vaginally and anally, and would not stop when he was asked to." In Dr. Peterson's view, after finally receiving professional psychological treatment, Ms. Deveny "was able to recognize that much of their relationship was rape." *Id.*

As a result of Bob's infliction of sexual pain and injury, Ms. Deveny developed "vaginal and anal abscesses and fistulas beginning in 2007." *Id.* at 12. Over the course of next eight years, Ms. Deveny required repeated medical attention, including surgical interventions and

**Page 5 - DEFENDANT'S SENTENCING MEMORANDUM**

hospitalizations, for damage caused by her husband during unwanted, and unconsented to, sexual activity. *Id.*

While Bob Deveny's abusive sexual conduct was perhaps the most egregious aspect of his efforts to control and manipulate Ms. Deveny, it was only one manifestation. Another was his decision to "retire" from work around 2002, and rely on Ms. Deveny to support him. He asserted that he was suffering from depression and began isolating himself at home. *Id.* at 13. At the same time, he began to compulsively spend money without regard to their financial limitations. *Id.* Dr. Peterson described her interactions with Bob Deveny about his spending thusly:

> He was a hoarder, and he often laughed about the number of packages that came to the house and how he hid things from her. And he knew it was stupid, because she saw the bills because she paid everything, but he liked to get things over on her. He had this studio where he had his photographic equipment and motorcycles and a car, and he had not been there in three years, I think, and he told me it would take – I suggested he get a POD to put things in, and he said it would take four to five PODs to empty it out. And they had a massive house, I think it's 3800 or 4200 square feet, and it wasn't enough to contain all the stuff. He wore a lot of jewelry, bought Lori a lot of jewelry. He bought a lot of guns and trains and photographic equipment. He probably bought 30 cameras while I knew him. He said that 'if she didn't like it, she could show me the bills,' and he would stop, 'but I know she never will.' And once a year or so he would freak out about the American Express bill, that it was, I don't know, $30,000 over the limit, but then he'd book another trip, and he'd say, 'If she doesn't like it she can tell me to stop,' but she would tell him to stop, and he didn't. And I pointed it out, and he said, 'She did not do anything about it.'

*Id.* at 21.

Around 2006 or 2007, Ms. Deveny came to the realization that she could no longer pay their bills. Her efforts to control her husband's spending were unsuccessful, and he suggested to her that she borrow from her trust account and then backfill it later. *Id.* at 15. Against her better judgment, Ms. Deveny did so. Unsurprisingly, this short-term fix did not last long and soon Ms.

Deveny was unable to pay her trust account back in a timely manner, which ultimately led to the offense conduct she now stands before the Court to answer for.

To be sure, aspects of the couple's spending benefitted Ms. Deveny, such as jewelry purchased for her or trips that she accompanied Bob on. But Ms. Deveny's overarching motive was to help her husband and maintain her marriage, even as those actions destroyed her entire career and victimized clients she deeply cared about. In attempting to understand how someone in Ms. Deveny's position would make those choices, Dr. Peterson opined:

> Well, she had made her whole life about him when she married him. She agreed to not have children, and he was older, and she decided he would be her life. At that point, she was still a very young Nazarene woman, I believe. They are very isolated from the world. She was [a] virgin until she slept with Bob, and she had never been with anybody else, and I think she truly believed that, as smart as she was, that being an attorney was important, but being a wife was more important.

*Id.* at 20. Dr. C. Chyrelle Martin similarly concluded:

> It is difficult to reconcile the woman with whom I spoke in this evaluation – an intelligent and successful litigator – with the woman who allowed herself to be manipulated and used throughout her marriage. Intelligent women do fall victim to domestic violence, however, through the use of the right fulcrum. In Ms. Deveny's case, it appears that her belief in the importance of marriage and her husband's willingness to use her insecurities against her constituted the fulcrum that created her vulnerability to manipulation and exploitation.

*Id.* at 22.

This case is not about a serial fraudster or a greedy criminal looking to take advantage of vulnerable individuals. Ms. Deveny is a well-meaning person who loved practicing the law and helping her clients. Her individualized circumstances led her to making terrible and criminal choices that have hurt her and the people she cared for greatly. Given the unique circumstances and motives behind Ms. Deveny's actions, a five-year term of imprisonment is a reasonable and just punishment.

**Page 7 - DEFENDANT'S SENTENCING MEMORANDUM**

## II.    The Remaining Factors in 18 U.S.C. § 3553(a) Also Support the Requested 60-Month Sentence.

In determining what sentence is sufficient but not greater than necessary, this Court must also consider factors such as deterrence, the need to protect the community, and consistency in sentencing. Here, none of those factors support a sentence longer than 60 months' imprisonment.

When considering specific deterrence and the need to protect the community from further crimes by Ms. Deveny, there is simply no need for any prison sentence at all. She has zero prior criminal history and has never previously shown a desire to break the law. Moreover, her crimes were committed under a unique and specific set of circumstance which no longer exist. Her husband committed suicide the same year Ms. Deveny resigned from the bar. Her criminal conduct was specific to her practice of law, which she can no longer do. Indeed, she currently presents so low of a threat that the Federal Pretrial Services office determined that she did not need active supervision.

To the extent that general deterrence exists in this case, a five-year term of imprisonment, coupled with the restitution obligation and the myriad of collateral consequences Ms. Deveny has already suffered, is sufficient punishment. She is 57 years old and has lost essentially everything she has worked for her entire life. She is ostracized and banned from the only profession she has known. Her name and reputation, once unassailable, are in tatters. Once she is released from prison, she will spend the foreseeable future working primarily to repay the heavy debt she owes. Regardless of the length of the prison sentence this Court imposes, no rational observer of this case would be anything other than deterred by Ms. Deveny's fate.

Finally, with respect to unwarranted disparities between defendants convicted of similar conduct, a five-year term of imprisonment is consistent with similar cases in this district. Two

recent cases are particularly apt for comparison, as they involved licensed professionals convicted of similar criminal activity: *United States v. Nathan Wheeler*, 3:18-cr-00161-IM, and *United States v. Pamela Hediger*, 3:18-cr-00459-BR.

Mr. Wheeler was a Certified Public Accountant who, according to the government, stole money from his clients to "live an extravagant and decadent life he could not otherwise afford" and to pursue a future business opportunity in recreational marijuana sales. Dkt. Entry 26 at 1 (government sentencing memo). Among others, his victims included minor children and retiring couples. The government alleged a total loss of over $4 million and, despite that the defendant contested that amount, recommended a total sentence of only 51 months' imprisonment. The defense sought a probationary sentence. Judge Immergut ultimately found the loss to be over $4 million and sentenced Mr. Wheeler to 51 months in custody.

Ms. Hediger was an Oregon attorney specializing in personal injury cases who, among other crimes, stole money that "came from insurance proceeds that were due and payable to [her] clients." Dkt. Entry 13 at 3 (government sentencing memo). The government alleged a $1.9 million total loss, and argued that the defendant used the money to remodel her home and to pay for lavish vacations, plastic surgery, and other personal expenses. *Id.* at 4. The parties jointly recommended a sentence of 46 months' imprisonment to run concurrent with a 48-month state sentence for aggravated theft, identity theft, and tax evasion, which Judge Brown ordered.

Case comparisons are difficult as each defendant and her personal circumstances are different, but as the above two matters show, a 60-month sentence for Ms. Deveny would be consistent with how the government and the courts have treated licensed professionals who stole from their clients in the District of Oregon.

**Page 9 - DEFENDANT'S SENTENCING MEMORANDUM**

Ms. Deveny greatly regrets her conduct and the harm she has caused her former clients. Unfortunately for her, the only thing she can do now to make amends is take full responsibility for her actions. In doing so, she does not ask this Court to give her a pass from incarceration—she requests that a significant sentence of 60-months' imprisonment be imposed. Such a punishment is just and reasonable under the factors listed in 18 U.S.C. § 3553(a), and is sufficient, but not greater than necessary. Accordingly, the defense respectfully requests that the Court order that sentence.

RESPECTFULLY submitted January 5, 2023.


*/s/ Mark Ahlemeyer*
Mark Ahlemeyer
Attorney for Defendant